# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CESAR RIVAS, *et al.*,

       *Plaintiffs*,

   v.

UNITED AMERICAN SECURITY, LLC, *et al.*,

       *Defendants*.

Civil Action No. 23‑3748 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

Cesar Rivas and Enyis Velasquez are employed by GardaWorld, a security firm that provides services throughout the District of Columbia.[1] They allege that for the past five years, GardaWorld has assigned them to security officer positions without paying them the mandatory security officer minimum wage, resulting in underpayment of wages, overtime, and fringe benefits. The Plaintiffs sued GardaWorld and Jones Lang LaSalle Americas, Inc. (JLL), a property management company, bringing claims under the Fair Labor Standards Act, the D.C. Minimum Wage Act, and the D.C. Wage Payment and Collection Law, as well as claims for unjust enrichment and breach of contract.

The Defendants now seek summary judgment on the Plaintiffs' claims. They argue that Mr. Rivas and Ms. Velasquez are not "security officers" under the relevant minimum wage statutes; that the buildings where they worked are not "office buildings"; and that even if the

---

[1] The Plaintiffs sued United American Security, LLC, which was purchased by GardaWorld in March 2018, and does business in the District of Columbia under that name. Defs.' Statement of Material Facts (DSOF), ¶ 34, ECF No. 43. Accordingly, the Court refers to the Defendant United American Security as GardaWorld.

Plaintiffs did work as "security officers," District law does not entitle them to an hourly fringe benefit payment for overtime hours. The Defendants also assert that JLL and GardaWorld had no contractual relationship at any of the properties where the Plaintiffs worked, and that JLL cannot be held liable as a joint employer, contractor, or subcontractor. For the reasons below, the Court grants the Defendants' motion in part and denies it in part. The Court will proceed to trial on the claims that survive dismissal.

## BACKGROUND

### A.    Statutory Background

Over the past two decades, the D.C. Council has made significant adjustments to the regulatory regime governing the employment and payment of security officers in the District of Columbia. In the years following the 9/11 terrorist attacks, the Council recognized that while government and private businesses were increasingly relying on private security services to supplement traditional law enforcement, there were "gaps and inconsistencies" in the "District's body of law and regulations governing the security industry." D.C. Comm. Rep., B. 16-102 (May 30, 2006) at 1. These gaps included a "fail[ure] to mandate uniformity of basic requirements" for becoming a security officer. *Id.* The Council sought to address these gaps by enacting the Enhanced Professional Security Amendment Act of 2006, D.C. Law 16-187, which, among other things, established "standards for employment, registration, [and] minimum required training" for "security officers" and "special police officers." D.C. Comm. Rep., B. 16-102 at 1. The new standards were largely codified in Title 17, Chapter 21 of the D.C. Municipal Regulations, which addresses "Security Officers and Security Agencies." DCMR tit. 17, §§ 2100–2199.

The 2006 changes were intended to benefit "residents, workers, visitors, and private security personnel with the ultimate goal of improving public safety." D.C. Comm. Rep., B. 17-199 (Nov. 13, 2007) at 1. The Council quickly realized, however, that "[h]igh turnover in the

industry . . . threaten[ed] to undo that goal," and that "[o]ne of the main reasons for high turnover" was "poor wages." *Id.* To fix that issue, the Council passed the Enhanced Professional Security Amendment Act of 2008, D.C. Law 17-114, which set a higher minimum wage for security officers by amending the District's Minimum Wage Act (DCMWA).

As amended, the DCMWA now requires that "security officer[s] working in an office building" be paid "wages, or any combination of wages and benefits" that meet or exceed the rate set for a "guard 1 classification" under federal law.[2] D.C. Code § 32–1003(h). The DCMWA defines the term "security officer" as having "the same meaning as provided in section 2100 of Title 17 of the District of Columbia Municipal Regulations." D.C. Code § 32–1002(7A). That regulatory section, as amended in 2006, provides that a security officer is "any person privately employed to do any of the following":

(a) Prevent the theft, misappropriation, or concealment of goods, wares, merchandise, money, bonds, stock certificates, or other valuable documents, papers, and articles;

(b) Prevent damage to real or personal property;

(c) Prevent assaults, gate-crashing, or other disorders at meetings, events, or performances; or

(d) Prevent similar illegal occurrences.

DCMR tit. 17, § 2100.1. Additional provisions in Section 2100 and throughout Chapter 21 further specify who is included in the definition of security officer and the training, qualification, and certification requirements that such individuals must meet.

---

[2] This rate is "established by the United States Secretary of Labor pursuant to Chapter 67 of Title 41 of the United States Code (41 U.S.C. § 6701 *et seq*.), as amended." D.C. Code § 32–1003(h). According to the Plaintiffs, the total minimum compensation required by this provision was $21.82 per hour from July 1, 2020, through June 30, 2022; $22.66 per hour from July 1, 2022, through June 30, 2023; and $24.19 per hour from July 1, 2023, through June 30, 2024. Second Am. Compl. (SAC) ¶ 65; *see also* Calandra Decl., Ex. S, ECF 43-3. The Defendants have not disputed the Plaintiffs' account of the relevant rates.

### B.    Factual Background

The Court draws the facts from the Defendants' Statement of Material Facts (DSOF), ECF No. 43, and the Plaintiffs' response to that Statement, Pl.'s Resp. to DSOF (PSOF), ECF No. 45-18. The Court assumes the facts in the Defendants' Statement to be true unless the Plaintiffs have specifically disputed them. *See* Fed. R. Civ. P. 56(e)(2); *see also* LCvR 7(h)(1).[3] The Court also draws undisputed background facts from the Second Amended Complaint (SAC). ECF No. 29.

GardaWorld is a "licensed security agency business in Washington, D.C. with the mission '[t]o make the world a safer place by protecting [its] client's people and assets everywhere.'" DSOF ¶ 22. The company operates several divisions in the District, including its "GardaWorld Guarding division," which provides a range of services for "retailers, residential buildings, commercial real estate, medical facilities, and TV networks." DSOF ¶¶ 24, 26. GardaWorld provides security services at several buildings including, as relevant here, 1752 N Street NW, 1201 New York Avenue NW, and 1200 New Hampshire Ave NW. DSOF ¶¶ 3, 11, 15.

"JLL is a global commercial real estate and investment management company that helps clients buy, build, occupy, manage and invest in a variety of commercial, industrial, hotel, residential and retail properties." DSOF ¶ 27 (cleaned up). JLL is a licensed Real Estate Organization in the District where it "focuses on providing 'tailored commercial real estate solutions' through investor services, property management and agency leasing." DSOF ¶¶ 30, 27, 29. JLL provides property management services at 1201 New York Avenue. *See* DSOF ¶¶ 15–16, Exs. E, F.

---

[3] Local Rule 7(h) provides that "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1).

Cesar Rivas was hired by United American Security in 2018 and became an employee of GardaWorld in March 2018 when GardaWorld purchased United American Security. DSOF ¶¶ 32, 34. Mr. Rivas received a security officer license on December 26, 2018, DSOF ¶ 33, and later obtained a special police officer (SPO) license in September 2023, DSOF ¶ 35.

Enyis Velasquez has worked for GardaWorld since October 2019. DSOF ¶ 39; SAC ¶ 71. She worked as an SPO for several different security firms before joining GardaWorld and has an active SPO license. DSOF ¶¶ 38–40. On November 15, 2024, Ms. Velasquez obtained a security officer license through Security Assurance Management, Inc., "where she began concurrently working a second job." DSOF ¶ 41.

Mr. Rivas and Ms. Velasquez have worked for GardaWorld at multiple locations over the years, including 1200 New Hampshire Ave and (for Mr. Rivas) 1201 New York Ave. DSOF ¶¶ 20–21, Exs. G, H. But they have both spent the bulk of their time at 1752 N Street, a building owned by the American Society of Microbiology and managed by the Lincoln Property Company. *Id.*; *see also* DSOF ¶ 45; ¶ 3, Ex. B; PSOF ¶¶ 46, 55. Mr. Rivas typically works a day shift at 1752 N Street (7:00 a.m. to 3:00 p.m.) while Ms. Velasquez works a night shift (11:00 p.m. to 7:00 a.m.). DSOF ¶¶ 20–21, PSOF ¶¶ 46, 55.

The duties performed by Mr. Rivas and Ms. Velasquez at 1752 N Street "are exemplary of the duties" they have performed "at all locations." *See* Defs.' Mot. Summ. J. (Mot.) 6, ECF No. 43; *see also* Pls.' Opp'n Mot. Summ. J. (Opp'n) 5–10, ECF No. 45 (focusing discussion of the "Plaintiffs' Role as Security Officers" on their responsibilities at 1752 N Street). And those duties are largely captured in "post orders"—documents drafted by GardaWorld that detail the services that its "security professionals" provide to Lincoln Properties. DSOF ¶ 3, Ex. B, Lincoln Post Orders (PO); Opp'n 7.

The post orders for 1752 N Street apply to "all security professionals" working at that location and define their responsibilities as "[p]rotecting your environment by staying on patrol, monitoring surveillance equipment, performing building inspections, guarding entry points, report taking, and verifying visitors." PO 1–2. The post orders direct each security professional to:

- Provide excellent customer service.
- Monitor building activity.
- Complete any specific tasks/job duties assigned by your client and direct manager.
- Remain visible, alert, and aware while on post for your shift. Only stepping away when properly relieved or given permission by property management.
- Report any tenant concerns to property management immediately.
- Complete detailed incident reports as needed. All incident reports are to be submitted the same day/shift as the incident.
- Monitor the loading dock, lobby activity, roundabout traffic, parking, and garages.
- Complete Daily Activity Log throughout your shift.
- Respond to emergencies, alarms, propped doors, trespassers, panhandlers and any client needs as requested.
- Conduct periodic tours every 2 hours. Use your professional discretion, if you notice an increase in lobby traffic postpone your tour (be sure to log this).

PO 2. The post orders further instruct security professionals to wear their "full GardaWorld issued uniform (blue blazer, tucked in white buttoned shirt, blue pants, black belt, dark colored dress socks, black polished shoes and ties)" for their "entire shift." PO 2, 4. Both Mr. Rivas' and Ms. Velasquez's uniforms include patches that identify them as a "Security Officer" and a "Special Police Officer," respectively. DSOF ¶ 65, Ex. N (Velasquez Uniform); DSOF, Ex. I, Rivas Dep. 113:21–114:6.

### C.    Procedural Background

Mr. Rivas filed this lawsuit against GardaWorld on December 16, 2023, alleging that for the preceding three years he had not been paid the District's minimum wage for security officers. ECF No. 1. On February 14, 2024, Mr. Rivas amended his Complaint and added Ms. Velasquez

as a Plaintiff. ECF No. 12. On December 2, 2024, the Plaintiffs amended for a second time, adding JLL as a Defendant. *See* SAC, ECF No. 29. The operative Second Amended Complaint brings claims against GardaWorld and JLL under the Fair Labor Standards Act (FLSA) (Count I), the DCMWA (Count II), and the D.C. Wage Payment and Collection Law (DCWPCL) (Count III). *Id.* It also brings claims of unjust enrichment against both Defendants (Count IV) and breach of contract against GardaWorld (Count V). *Id.*

On May 23, 2025, the Defendants moved for summary judgment on all claims. Mot., ECF No. 43. The Defendants alternatively requested that the Court stay proceedings pending a class certification ruling in *Chang v. United American Security, LLC*, No. 24-cv-2377 (D.D.C.), which is pending before another court in this District and involves similar claims brought on behalf of a putative class. The Defendants withdrew their request for a stay when it appeared that the plaintiffs in *Chang* would be subject to individual arbitration. Defs.' Reply at 23, ECF No. 23. But after the arbitrator in *Chang* determined that the individual claims were not subject to arbitration, the Defendants renewed their request for a stay. *See* Joint Status Report at 10, ECF No. 55. The Court held a status conference on January 29, 2026, to discuss the relationship between this case and *Chang* and to confirm that the Plaintiffs understood how a ruling in this case might affect their participation as class members in *Chang* and vice versa. At that hearing, counsel for the Plaintiffs reiterated the Plaintiffs' desire to have this lawsuit resolved expeditiously. Counsel represented that if a class is certified in *Chang*, the Plaintiffs would exercise their right to opt out of that class in light of this lawsuit at the appropriate time. After the hearing, the Plaintiffs submitted a notice confirming the same, ECF No. 57, and the Defendants submitted supplemental briefing in support of their request for a stay, ECF No. 58, to which the Plaintiffs responded, ECF No. 60. The

Defendants' motion for summary judgment or to stay proceedings is now fully briefed and ripe for decision. *See* Opp'n; Reply; Pls.' Surreply, ECF No. 50; Defs.' Sur-Surreply, ECF No. 51.

## LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It then falls to the nonmoving party to point to evidence that there is such an issue that must proceed to trial. *Id.* 324. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

A district court has "broad discretion" to stay proceedings pending before it. *Hisler v. Gallaudet Univ.*, 344 F. Supp. 2d 29, 35 (D.D.C. 2004). This discretion flows from a court's inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). A court may grant a stay where it finds that doing so is "efficient for its own docket" and is "the fairest course for the parties." *Hisler*, 344 F. Supp. 2d at 35 (cleaned up).

## DISCUSSION

The Court first addresses the Defendants' motion for summary judgment on the Plaintiffs' statutory and common law claims, and then it turns to the Defendants' alternative request for a stay. As explained below, summary judgment is inappropriate as to most of the Plaintiffs' claims and a stay is not warranted.

### A.    Statutory Claims

The Plaintiffs' three statutory claims for unpaid wages (under the FLSA, DCMWA and DCWPCL) all hinge on whether the Plaintiffs were entitled to the security officer minimum wage mandated by the DCMWA.[4] Under the DCMWA, employers must pay "security officers" working in an "office building" in the District "any combination of wages and benefits, that are not less than the combined amount of the minimum wage and fringe benefit rate . . . for the guard 1 classification established by the United States Secretary of Labor pursuant to Chapter 67 of Title 41 of the United States Code (41 U.S.C. § 6701 *et seq.*), as amended." D.C. Code § 32–1003. The Defendants argue that Mr. Rivas and Ms. Velasquez are not entitled to the security officer minimum wage because they are not security officers and they do not work in office buildings. And they argue that even if the Plaintiffs qualify for the security officer minimum wage, they cannot recover certain fringe benefits and overtime payments. The Court will address each issue in turn.

### 1.    Security Officers

The Court begins with the issue at the core of this lawsuit—whether Mr. Rivas and Ms. Velasquez are "security officers" under the DCMWA. The Defendants advance two arguments in support of their view that Mr. Rivas and Ms. Velasquez are not security officers. First, they argue that having a "security officer" certification "is a necessary component of qualifying" as a security officer under the DCMWA—a certification that Ms. Velasquez did not

---

[4] The Defendants' motion purports to seek summary judgment on all three statutory claims but it meaningfully addresses only the D.C. Code claims, referencing the FLSA in a single footnote regarding a 2023 FLSA rule setting the standard for determining joint employer status. Defs.' Mot. Summ. J. (Mot.) 28 n.25, ECF No. 43. Presumably the Defendants intended to argue that the FLSA claim fails for the same reasons the D.C. Code claims fail. But they did not say so. In any event, the FLSA claim survives summary judgment given the Court's rulings on the D.C. Code claims.

obtain until November 15, 2024. Mot. 15–21. Second, they argue that the Plaintiffs' job duties cannot qualify them as security officers under the statute. *Id.* 21–24. The Court agrees with the Defendants on the first point but not the second.

### a. Certification

First up is the Defendants' argument that individuals must hold a security officer certification to be a security officer under the DCMWA. The Court is persuaded that this reading of the statutory and regulatory scheme is correct.

Under the DCMWA, the term "security officer" has "the same meaning as provided in section 2100 of Title 17 of the District of Columbia Municipal Regulations." D.C. Code § 32–1002(7A). And section 2100.1 of Title 17 specifies that:

> [T]he term "security officer" means any person privately employed to do any of the following:
>
> (a) Prevent the theft, misappropriation, or concealment of goods, wares, merchandise, money, bonds, stock certificates, or other valuable documents, papers, and articles;
>
> (b) Prevent damage to real or personal property;
>
> (c) Prevent assaults, gate-crashing, or other disorders at meetings, events, or performances; or
>
> (d) Prevent similar illegal occurrences.

DCMR tit. 17, § 2100.1.

The Plaintiffs argue that the Court need look no further than the above provisions, which say nothing about certification. According to them, the DCMWA "refers to the *meaning* of "'security officer,' and § 2100.1 provides that a 'security officer *means* any person privately employed to' perform the listed functions." Opp'n 14. Thus, in the Plaintiffs' view, so long as they were performing one of the functions outlined in section 2100.1, they qualify for the security officer minimum wage.

The problem with the Plaintiffs' interpretation is that it ignores both the plain language of the DCMWA and the rest of the regulatory scheme that the D.C. Council enacted to "exercise[] some control over the training and certification of security officers." *Williams v. United Am. Sec., LLC*, 788 F. Supp. 3d 40, 45 (D.D.C. 2025). In defining a security officer, the DCMWA incorporates Section 2100 in its entirety, not just Section 2100.1. And Section 2100 references certification of security officers in multiple places, including providing that "each certification for a security officer" issued under the chapter "shall be effective for 2 years," describing training requirements for certification, and providing for the suspension or revocation of certification. *See* DCMR tit. 17, §§ 2100.4–.6. In other words, it is a premise of Section 2100 that security officers have a certification.

Chapter 21's definition of "certification"—which applies to Section 2100—provides further support. Section 2199.1 defines certification as "[t]he permission that must be granted by the Mayor before a person can lawfully be employed as a security officer in the District of Columbia." DCMR tit. 17, § 2199. Viewing these statutory provisions together, the Court concludes that the DCMWA's incorporation of the "meaning [of security officer] as provided by section 2100 chapter 17," *see* D.C. Code § 32–1002(7A), refers to individuals who have been properly certified to perform the functions specified in section 2100.1. After all, the entire regulatory scheme was designed by the D.C. Council to establish "standards for employment, registration, [and] minimum required training" for those who can be employed as security officers

in the District. D.C. Comm. Rep., B. 16-102 at 1. It would make little sense for the DCMWA to treat as "security officers" individuals who have not met those basic standards.[5]

This reading accords with that of the only other court to consider the issue. In *Williams*, another similar lawsuit brought against GardaWorld in this District, the plaintiff advanced the same argument: that she did not need a security officer certification to qualify for the DCMWA's security officer minimum wage. The court disagreed. It noted that "if the D.C. Council meant to reference only section 2100.1, it would have said so." *Williams*, 788 F. Supp. 3d at 45. That the Council instead "referred to section 2100 in in its entirety, means that it intended that the entire section would give meaning to the use of the term in the [DCMWA]—including not only the duties of a 'security officer' contained in section 2100.1, but also the regulatory provisions attending that definition found elsewhere in the chapter." *Id.* The court further noted that reading the statute as the plaintiff suggested would "undermine the scheme that the D.C. Council established" to regulate the security officer profession. *Id.* And this Court agrees. "It simply cannot be the case that an individual not yet certified to perform the duties of a 'security officer' . . . would be entitled to the wages attending that regulated profession." *Id.*

The upshot of this analysis is that Ms. Velasquez cannot establish that she was entitled to the "security officer" minimum wage mandated by the DCMWA for any hours worked before November 15, 2024, when she obtained a security officer certification.

---

[5] This is not to cast blame on Ms. Velasquez and others for accepting positions with security officer duties without first obtaining certification. Security agencies like GardaWorld are prohibited by District law from employing individuals as security officers who are not qualified and who have not satisfied the criteria for certification. *See* DCMR tit. 17, §§ 2101, 2108, 2111.8, 2126 (specifying duties imposed on agencies to verify suitability of security officer applicants, to facilitate applicants' ability to obtain certification, to regularly furnish the mayor's office with information about every security officer they employ, and to ensure security officer employees meet mandatory training requirements).

Ms. Velasquez makes a last-ditch effort to avoid this conclusion by asserting that her SPO certification should suffice in the absence of a security officer certification. *See* Pls.' Surreply 2. She points to record evidence supporting that an SPO certification qualifies an individual to do essentially anything a security officer does and more. *See, e.g.*, DSOF, Ex. K, Johnson Dep. 198:2–12 (discussing how SPO licensing is a "higher" licensing). But the plain language of Section 2100 forecloses this argument. It expressly provides that "security officer" does not include "[p]ersons commissioned as special police officers." DCMR tit. 17, § 2100.3.[6]

For all these reasons, the Court grants the Defendants' motion for summary judgment as to any portion of Ms. Velasquez's claims predicated on work performed before she obtained her security officer certification in November 2024.

### b. Duties

The Defendants next argue that even with proper certifications, Mr. Rivas and Ms. Velasquez cannot establish that they were employed to fulfill any of the duties specified in section 2100. Mot. 21–24. The Court disagrees.

Recall that an individual may qualify as a security officer under the DCMWA if, in addition to being certified, they are employed to: "(a) [p]revent the theft, misappropriation, or concealment

---

[6] Like the plaintiff in *Williams*, Mr. Rivas and Ms. Velasquez point out that the District's regulatory scheme may be open to manipulation by employers. Opp'n 15; *Williams v. United Am. Sec., LLC*, 788 F. Supp. 3d 40, 46 n.3 (D.D.C. 2025). Because the regulatory scheme gives agencies like GardaWorld control over key parts of the certification process, they could potentially flout their obligation to pay their employees appropriate wages by deploying them to fulfill officer duties while at the same time undermining their ability to obtain certification. Opp'n 15–16 (citing, for example, section 2108.5 of Title 17 of the DCMR which requires the employer to submit the certification application, pay application fees, and confirm the applicant has completed required training). This may be a valid concern. But as in *Williams*, Ms. Velasquez points to no evidence that GardaWorld obstructed or delayed her ability to obtain a security officer license. In any case, any deficiencies in the statutory and regulatory scheme are for the D.C. Council to address, not the Court. *See Williams*, 788 F. Supp. 3d at 46 n.3 ("[T]he Court lacks the power to rewrite the statute . . . ; that is an issue for the legislature.").

of goods, wares, merchandise, money, bonds, stock certificates, or other valuable documents, papers, and articles; (b) [p]revent damage to real or personal property; (c) [p]revent assaults, gate-crashing, or other disorders at meetings, events, or performances; or (d) [p]revent similar illegal occurrences." DCMR tit. 17, § 2100.1.

At 1752 N Street, the primary location at issue here, the post orders define the responsibilities of each security professional, including Mr. Rivas and Ms. Velasquez, as "[p]rotecting your environment by staying on patrol, monitoring surveillance equipment, performing building inspections, guarding entry points, report taking, and verifying visitors." PO 2. They similarly direct the Plaintiffs to "monitor building activity" and "respond to emergencies, alarms, propped doors, trespassers, panhandlers, and any client needs as requested.'" *Id.* A reasonable jury could well conclude that these fall within the responsibilities outlined in the DCMWA for security officers, which include preventing assaults, gate-crashing, and other disorders or similar illegal occurrences. DCMR tit. 17, § 2100.1.

Indeed, in *Williams*, the court found "as a matter of law" that the plaintiff there had been "operating as a 'security officer' within the meaning of the DCMWA" when GardaWorld assigned her duties that are nearly identical to the duties at issue here. *See Williams*, 788 F. Supp. 3d at 46–47. The plaintiff in *Williams* had been assigned to 1200 New Hampshire Ave, where both Mr. Rivas and Ms. Velasquez have worked shifts. *Id.*; *see* DSOF, Exs. G & H.[7] And the relevant duties in the 1200 New Hampshire Ave post orders mirror those in the 1752 N Street post orders. Focusing on the requirement that individuals "'[r]espond to emergencies, alarms, propped doors, trespassers, panhandlers, and any client needs as requested,'" the court noted that trespassing is a

---

[7] The Plaintiffs' shifts at 1200 New Hampshire are coded in their time keeping reports as "Al Jazeera" for the GardaWorld client served at that location.

crime in the District. *Id.* (citing D.C. Code § 22–3302). It thus found that the plaintiff's employment fell "squarely within the definition of 'security officer,' as she ha[d] been employed to '[p]revent . . . illegal occurrences' that are 'similar' to those identified in the regulations, like 'gate-crashing.'" *Id.*

Unlike the plaintiff in *Williams*, Mr. Rivas and Ms. Velasquez have not moved for summary judgment. This Court thus has not been asked to conclude as a matter of law that the Plaintiffs are entitled to the security officer minimum wage, and it declines to go that far. But it finds that a reasonable jury could conclude that the duties assigned to Mr. Rivas and Ms. Velasquez qualify them as security officers under the DCMWA. Accordingly, this is not a basis to grant summary judgment for the Defendants.

### 2. Office Buildings

The Defendants next argue that the Plaintiffs did not work "in an office building" as required by the DCMWA. D.C. Code § 32–1003(h). This argument is not compelling.

The DCMWA defines "office building" as:

> any commercial property where the primary functions are the transaction of administrative, business, civic, or professional services, including properties where handling goods, wares, or merchandise, in limited quantities, is accessory to the primary occupancy or use. The term "office building" does not include libraries, museums, or universities.

D.C. Code § 32–1002(6A). Looking to this definition, the Defendants argue that neither 1752 N Street nor 1200 New Hampshire Ave are office buildings. As to 1752 N Street, they argue that the American Society of Microbiology (ASM), the owner and primary tenant of the building, is a non-profit organization "whose most significant activity is '[t]o promote and advance the microbial sciences' . . . by being the 'home for microbial scientists from around the globe to connect, learn, discover and prepare for the future.'" Mot. 24 (citations omitted). As such, the Defendants argue that ASM's use of 1752 N Street is more analogous to that of a library or

university rather than a "commercial property where the primary functions are the transaction of administrative, business, civic, or professional services." *Id.* And as to 1200 New Hampshire Ave, the Defendants argue that because "GardaWorld provides services *only* to Al Jazeera International's *news studio*"—not the building as a whole—the Plaintiffs' work at that location cannot be considered to have been "in an office building." *Id.* 25. They further contend that Al Jazeera's activities do not qualify 1200 New Hampshire Ave as an "office building." Reply 17; Defs.' Sur-Surreply 4–5. These arguments are utterly meritless.

"In addressing a question of statutory interpretation, [the Court] begin[s] with the text." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020) (quoting *City of Clarkesville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018)). Here, the DCMWA defines "commercial property" as property "where the primary functions are the transaction of administrative, business, civic, or professional services." D.C. Code § 32–1002(6A). But it does not then define those terms. So the court looks to their "ordinary meaning." *Eagle Pharms.*, 952 F.3d at 331–32; *see also Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 432 (D.C. Cir. 2023). ("When a term goes undefined in a statute, we give the term its ordinary meaning." (quoting *Taniguchi v. Kan Pac. Saipan*, Ltd., 566 U.S. 560, 566 (2012))). And the ordinary meaning of those terms is broad.

"Administrative," for example, is generally defined as "of or relating to administration or an administration: relating to the management of a company, school, or other organization." *Administrative*, Merriam-Webster.com Dictionary [https://perma.cc/3X6Y-CMU9] (last visited Jan. 26, 2026); *see also Administrative*, Oxford English Dictionary [https://doi.org/10.1093/OED/9498892130] (last visited Jan. 26, 2026) ("Of, relating to, or concerned with administration (in various senses); . . . relating to or required for the running of a business, organization, etc."). And a "professional service" is "a service requiring specialized

knowledge and skill usually of a mental or intellectual nature and usually requiring a license, certification, or registration." *Professional service*, Merriam-Webster.com Legal Dictionary, [https://perma.cc/3PKT-QYUZ] (last visited Jan. 26, 2026).

The activities of ASM—an "organization" providing services and a "home" for scientists with "specialized knowledge and skill of a mental or intellectual nature"—seem to fit comfortably within these definitions. And the activities of Al Jazeera International—a news studio presumably staffed by professional journalists, editors, and other news personnel—appear to as well. The Defendants provide no compelling reason to conclude that the D.C. Council intended to draw a line between offices housing scientific non-profits or news organizations and other office buildings. At a minimum, the Defendants are not entitled to summary judgment on this point.

The Defendants' alternative argument regarding 1200 New Hampshire Ave—that the Plaintiffs work at that location was not "in an office building" because they served only a specific unit in the building rather than the building as a whole—is even less persuasive. *See Williams*, 788 F. Supp. 3d at 47 n.4 (explaining that the argument that a "plaintiff's posting within an interior component of a larger commercial building somehow renders her 'outside' the building strains credulity").

### 3.    Fringe and Overtime Benefits

Finally, the Defendants argue that even if the Plaintiffs qualify for the security officer minimum wage, they (1) cannot recover fringe benefit payments for hours they worked beyond forty hours in a week; and (2) their fringe benefit payments do not affect how their appropriate overtime rate is calculated. Mot. 25–27. They are right about the first point, but wrong on the second.

### a. Fringe Benefit Cap

Beginning with the cap on fringe benefits, the DCMWA requires that "security officer[s]" be paid "wages, or any combination of wages and benefits, that are not less than the combined amount of the minimum wage and fringe benefit rate . . . for the guard 1 classification established by the United States Secretary of Labor pursuant to Chapter 67 of Title 41 of the United States Code (41 U.S.C. § 6701 *et seq.*), as amended." D.C. Code § 32–1003. The U.S. Code chapter incorporated by reference comes from the Service Contract Act (SCA). Among other things, that chapter gives the U.S. Secretary of Labor the authority to "specify[] the fringe benefits to be provided to each class of service employee engaged in the performance of [a] contract" with the federal government. 41 U.S.C. § 6703(2). It explains that "fringe benefits" can include things like health insurance, unemployment benefits, or vacation and holiday pay. *Id.* And it states that employers can satisfy their obligation to provide fringe benefits by providing "any equivalent combinations of fringe benefits or by making equivalent or differential payments in cash." *Id.*

Here, the Parties do not dispute that GardaWorld paid Mr. Rivas and Ms. Velasquez their fringe benefits in cash. *See* DSOF, Exs. G & H (timekeeping reports showing "UAS Supplemental $4.54"); *see also* SAC ¶¶ 67, 93 (paystubs showing payment for "DC Supplement"). But they disagree about whether GardaWorld was obligated to pay them a fringe benefit supplement for hours they worked beyond forty hours in a week. The Defendants argue that they were not so obligated. The Court agrees.

The DCMWA provision outlined above incorporates the minimum wage and fringe benefit rate determinations made by the Secretary of Labor under the SCA. The District's Office of Wage-Hour's determinations regarding the Security Officer Minimum Wage affirm this incorporation. For example, the Office of Wage-Hour's determination covering July 1, 2024,

through June 30, 2025, provides that the security officer minimum wage in the District "shall be no less than $19.39 per hour, plus an additional $4.98 per hour for health and welfare fringe benefits, and all holiday benefits, as required by Revision No. 27 of the SCA Wage Determination No. 15-4281, issued by the United States Secretary of Labor." *See* Calandra Decl. ¶ 21, Ex. S, ECF No. 43-3. The Secretary's Revision No. 27 in turn provides that individuals working as a "guard 1" are entitled to a "HEALTH & WELFARE" fringe benefit rate of "$4.98 per hour, *up to 40 hours per week*." Calandra Decl. ¶ 20, Ex. R (Rev. No. 27), ECF No. 43-3 (emphasis added).[8] This language unambiguously caps an individual's entitlement to an hourly fringe benefit at forty hours per week. And the Court sees no basis for ignoring this cap. The D.C. Council clearly intended to incorporate "the minimum wage and fringe benefit rate" set by the Secretary of Labor for the "guard 1 classification," D.C. Code § 32–1003, and the Secretary of Labor just as clearly determined that adequate compensation for that classification includes hourly fringe benefit payments only up to forty hours per week, Rev. No. 27; *see also Dantran, Inc. v. U.S. Dep't of Lab.*, 171 F.3d 58, 62–65 (1st Cir. 1999) (providing a detailed analysis for why, under the SCA, employees are "only entitled to fringe benefit payments up to a maximum of 40 hours per week"). Accordingly, the Court grants the Defendants' summary judgment motion as it relates to Mr. Rivas' and Ms. Velasquez's ability to recover unpaid fringe benefits for hours worked beyond forty in a week.

---

[8] This "up to 40 hours per week" limitation is included in every revision made to Wage Determination No. 15-4281 since 2020. *See* Revisions Nos. 16–35 available at SAM.gov, https://sam.gov/wage-determination/2015-4281/35#history [https://perma.cc/CSQ3-CNS7]. The Court takes judicial notice of "information posted on official public websites of government agencies." *Arab v. Blinken*, 600 F. Supp. 3d 59, 63 n.1 (D.D.C. 2022) (citing *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013)).

### b.  Overtime Benefits

Turning next to the overtime rate, the DCMWA requires employers to pay employees at least "1 ½ times the[ir] regular rate" for any hours they work in a week "in excess of 40 hours." D.C. Code § 32–1003. The Defendants assert that any "fringe benefit rate" Mr. Rivas and Ms. Velasquez are entitled to is not part of the "regular rate" to be multiplied by 1.5 in determining their overtime compensation rate. Mot. 26–27. The Court disagrees.

As an initial matter, it is unclear why the Defendants seek summary judgment on this issue as the operative Complaint does not appear to seek overtime compensation at the rate the Defendants attack. *See* SAC ¶¶ 69, 95 (calculating the Plaintiffs' overtime wage as $29.09 by multiplying the DCMWA's then applicable $19.39 minimum wage for security officers by 1.5, without factoring in the $4.80 fringe benefit rate). Nonetheless, with the issue now in play, the Plaintiffs assert that their overtime rate can account for their fringe benefit payments. The Court concludes that the Plaintiffs have the stronger position. Opp'n 23–25.

Under the DCMWA, an employee's overtime rate must be at least 1.5 times their "regular rate." D.C. Code § 32–1003. The statute provides that "regular rate" means "all remuneration for employment paid to, or on behalf of, the employee, but shall not be considered to include the items set forth in the Fair Labor Standards Act of 1938 [FLSA], as amended, 29 U.S.C. § 207(e)(1), (2), (3), (4), (5), (6), and (7)." D.C. Code § 32–1002(7). Section 207(e) of the FLSA defines what is meant by "regular rate" using much the same general definition adopted by the DCMWA. And the section 207(e) subsections incorporated by the DCMWA list seven categories of payments that are not "deemed" part of an employee's "regular rate." *See* 29 U.S.C. §§ 207(e)(1)–(7).

The Defendants do not identify which of the section 207(e) categories applies to the cash payments that GardaWorld has made to Mr. Rivas and Ms. Velasquez in lieu of benefits. This is

perhaps unsurprising, because no category refers to cash payments in lieu of fringe benefits. *See Oliverio-Still v. AVMAC LLC*, No. 24-cv-0870, 2025 WL 674552, at *5 (S.D. Cal. Mar. 3, 2025). Indeed, at least one federal appeals court has found that such payments are not properly excluded under the FLSA. *See Flores v. City of San Gabriel*, 824 F.3d 890, 902 (9th Cir. 2016) (concluding that city's cash-in-lieu-of-benefits payments were not properly excluded from the regular rate of pay under sections 207(e)(2) or 207(e)(4)).

Rather than grapple with the above obstacles, the Defendants point instead to the DCMWA's previously discussed incorporation of 41 U.S.C. § 6701 in setting the security officer minimum wage. D.C. Code § 32–1003(h). It is no help. The Defendants are right that 41 U.S.C. § 6707(e) excludes certain "fringe benefit payments" from being treated as part of the "regular or basic hourly rate of pay" for the purpose of determining overtime pay. But the categories of fringe payments it excludes are those specified by "section 7(e) of the Fair Labor Standards Act"—in other words, the same exclusions already applied by the DCMWA's definition of "regular rate." D.C. Code § 32–1002(7). The only difference is that 41 U.S.C. § 6707 also incorporates an eighth category of excluded payments, *see* 29 U.S.C. § 207(e)(8), that the DCMWA definition does not capture through its incorporation of only sections 207(e)(1)–(7). That difference, however, is immaterial. The eighth category refers to "any value or income derived from employer-provided grants or rights provided pursuant to a stock option, stock appreciation right, or bona fide employee stock purchase program." 29 U.S.C. §§ 207(e)(8). No such payments are at issue here.

Perhaps at trial the Defendants will adduce additional evidence that their fringe benefit payments to Mr. Rivas and Ms. Velasquez do in fact fit one of the FLSA exemptions. For now, they have fallen well short of showing that they are entitled to summary judgment on that point.

B.    **Common Law Claims**

The Court next turns to the Plaintiffs' common law claims for breach of contract and unjust enrichment.

Starting with unjust enrichment, although the Defendants' motion purports to seek summary judgment on both the Plaintiffs' common law claims, it largely fails to address the claim for unjust enrichment. They assert in the introduction to their motion that there is "no basis for the Plaintiffs' unjust enrichment" claim. Mot. 3. But in the argument section they do not explain why and mention unjust enrichment only once in passing. *Id.* at 16. The Defendants' lackluster briefing does not demonstrate that they are "entitled to judgment as a matter of law" on the Plaintiffs' unjust enrichment claim. Fed. R. Civ. P. 56(a). Thus, that claim survives summary judgment.

As for the breach of contract claim, the Plaintiffs contend that they were intended third-party beneficiaries of a purported contract between GardaWorld and JLL. The Defendants retort that GardaWorld did not owe contractual duties to JLL at any of the properties where Mr. Rivas and Ms. Velasquez worked. And they argue that JLL cannot be held liable as a joint employer, contractor, or subcontractor. The Court agrees that GardaWorld is entitled to summary judgment on the Plaintiffs' breach of contract claim but disagrees about JLL's potential liability.

### a. Breach of Contract

The Plaintiffs' breach of contract claim is premised on the allegation that "GardaWorld and JLL entered into a contract under which GardaWorld agreed to provide security guard services" at five "JLL-Managed Properties":

(1) 1234 19th Street NW;

(2) 1020 19th Street NW;

(3) 4400 Jenifer Street NW;

(4) 1200 New Hampshire Ave NW; and

(5) 1201 New York Avenue NW.

SAC ¶¶ 126, 9–15. According to the operative Complaint, the contract between GardaWorld and JLL required GardaWorld to pay its security officers wages that complied with District law. SAC ¶ 127. Thus, the Complaint posits that when GardaWorld failed to pay Mr. Rivas and Ms. Velasquez the minimum wage and overtime rates prescribed by the DCMWA, GardaWorld breached its contractual duties to JLL and harmed the Plaintiffs as "intended third-party beneficiaries" of the contract. SAC ¶¶ 127–130. Now that discovery is complete, the Defendants claim that Mr. Rivas and Ms. Velasquez have adduced no evidence of a contract between GardaWorld and JLL to support their breach of contract claim. Mot. 27–29. The Court agrees.

To prevail on a breach of contract claim in the District of Columbia, "a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach." *Brown v. Sessoms*, 774 F.3d 1016, 1024 (D.C. Cir. 2014) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)). The Plaintiffs' breach of contract claim founders at step one.

The Defendants point to documents showing that the first three alleged "JLL-Managed Properties" (1234 19th Street, 1020 19th Street, and 4400 Jenifer Street) are in fact managed by Zuckerman Gravely Management. Calandra Decl., Exs., G, H, J, ECF No. 43-3. For the fourth building (1200 New Hampshire Ave), GardaWorld has produced evidence supporting that it provides services only to the Al Jazeera International news studio—not to the building as a whole—and has no contractual relationship with JLL for those services. Calandra Decl., Ex. K (security service contract between GardaWorld's predecessor Security Assurance Management, Inc. and Al Jazeera International USA, Inc.), ECF No. 43-3; *see also* DSOF, Ex. D (post orders

for 1200 New Hampshire Ave which do not indicate any relationship with JLL).[9] Finally, for 1201 New York Ave, the Defendants have produced a contract between GardaWorld and the building's owner, SPE LLC, that "lists JLL only as the Owner's Sub-Agent," supporting that "GardaWorld's only contractual obligations" at that location are to "SPE directly"—not to JLL. Mot. 29.

The evidence produced by the Defendants supports that GardaWorld has no relevant contractual obligations to JLL at the buildings in question that it could have breached. In response, the Plaintiffs have pointed to no contrary evidence or legal authority that supports a different conclusion. Opp'n 25–28. Indeed, the Plaintiffs do not respond to the Defendants' arguments regarding the existence of a contract at all, thus conceding this point. *See* LCvR 7(b) (providing that where a party does not timely file an opposition to a motion, "the Court may treat the motion as conceded"); *see also Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[Local Rule 7(b)] is understood to mean that if a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded."). Accordingly, the Court grants summary judgment for GardaWorld as to Count V.

### b.  Joint Employer Liability

The Defendants next argue that JLL is entitled to summary judgment on all the Plaintiffs' claims because the Plaintiffs cannot establish JLL's liability as a joint employer. Mot. 30. The Court denies summary judgment on this point but finds that the scope of JLL's liability as a joint employer is significantly limited.

The Plaintiffs seek to impose joint employer liability on JLL under the FLSA (Count I), the DCMWA (Count II), and the DCWPCL (Count III). All three statutes define the employment relationship expansively. *Harris v. Med. Transp. Mgmt., Inc.*, No. 17-cv-1371, 2025 WL 2556568,

---

[9] *Compare to* DSOF, Ex. F (Post Orders for JLL, 1201-1225 New York Ave.).

at *10 (D.D.C. Apr. 11, 2025); *see also Mills v. Anadolu Agency NA, Inc.*, 105 F.4th 388, 394 (D.C. Cir. 2024) (noting that the FLSA's broad definition of employment draws from state child-labor laws and "sweeps in work relationships that might not be treated as employment under other statutes or traditional agency principles"). And courts have interpreted the D.C. laws' coverage "coextensively with the FLSA's." *See Harris*, 2025 WL 2556568, at *10 (citing *Steinke v. P5 Sols., Inc.*, 282 A.3d 1076, 1084–85 (D.C. 2022); *Wilson v. Hunam Inn., Inc.*, 126 F. Supp. 3d 1, 5–6 (D.D.C. 2015); and *Thompson v. Linda & A., Inc.*, 779 F. Supp. 2d 139, 146 (D.D.C. 2011)).

Under these statutes, whether an entity is a joint employer "centers on economic realities." *Mills*, 105 F.4th at 398. The inquiry focuses on the "relationship between the employer who uses and benefits from the services of workers and the party that hires or assigns the workers to that employer." *Id.* at 399 (quoting *Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 137 (4th Cir. 2017)). The D.C. Circuit has conducted that inquiry by "look[ing] to factors that bear on the degree to which putative joint employers share control over typical employer prerogatives." *Id.* In so doing, it has been guided by a six-factor test laid out by the Fourth Circuit in *Salinas*. *Id.* And it has noted that "identifying a joint-employment relationship [is a] fact-intensive inquir[y]." *Id.* at 400.

The Fourth Circuit's six-factor test for joint employment considers: (1) whether the putative joint employers jointly share the power to "direct, control, or supervise the worker"; (2) whether they share power to "hire or fire the worker or modify the terms or conditions of the worker's employment"; (3) whether they have a permanent or long standing relationship; (4) whether one joint employer is controlled by the other or they are under common control; (5) whether the work at issue is performed on premises "owned or controlled by one or more of the putative joint employers"; and (6) whether the putative joint employers share responsibility over core employer functions, like "handling payroll" or providing equipment necessary for the

work. *See Harris*, 2025 WL 2556568, at *11 (quoting *Salinas*, 848 F.3d at 141–42). The list of factors is not exhaustive. *Salinas*, 848 F.3d at 142. No one factor is dispositive. *Id.* And the "ultimate determination of joint employment must be based upon the circumstances of the whole activity." *Id.* (quotation omitted). A court may find a person or entity is a joint employer where facts supporting even one factor demonstrate that they had "a substantial role in determining the essential terms and conditions of a worker's employment." *Id.*

Here, the Plaintiffs point to evidence on which a jury could reasonably conclude that JLL is a joint employer of GardaWorld security personnel at 1201 New York Avenue. Opp'n 25–28. Most notably, GardaWorld's contract with SPE governing the security services it will provide at that location gives JLL, as SPE's "Sub-Agent," significant authority. *See* Opp'n, Ex. 17, ECF No. 45-17. The contract provides that JLL is "the sole and exclusive point of contact with the Owner for communications regarding performance of the Contract Duties." Ex. 17 § 4.13. It requires GardaWorld to comply with any "rules or regulations reasonably imposed" by JLL and to provide security services "in accordance with policies and procedures established" by JLL. *Id.* § 5.3; *Id.* at 11. And the post orders for 1201 New York Avenue list at least twelve "site specific" duties to be fulfilled by security personnel that a jury could infer are duties set by JLL as SPE's Sub-Agent. *See* DSOF, Ex. F at 40–41.

This is not to say that the Plaintiffs' evidence supporting JLL's joint employer liability is overwhelming. It ultimately may not be enough. But for now, Mr. Rivas and Ms. Velasquez have adduced sufficient evidence from which a jury could reasonably conclude that JLL "has a substantial role in determining the essential terms and conditions of . . . employment" for GardaWorld personnel at 1201 New York Avenue. *See Salinas*, 848 F.3d at 142. That is enough to survive summary judgment.

The Plaintiffs may only pursue joint employer liability against JLL, however, as it relates to 1201 New York Avenue. As discussed with respect to Count V, the Plaintiffs have not adduced evidence that JLL has any role at the four other purportedly "JLL-Managed Properties." Nor have Mr. Rivas or Ms. Velasquez asserted that any other buildings where they worked have any relationship to JLL. *See* Opp'n 26–27 (focusing only on evidence pertaining to JLL's "exert[ion] of meaningful control over GardaWorld's officers" as "the property manager at 1201 New York Avenue"). In this respect, the Plaintiffs' victory on this front is limited. Ms. Velasquez's timekeeping records indicate that she has not worked any shifts at 1201 New York Avenue. *See* DSOF, Ex. H. And Mr. Rivas appears to have worked only eleven shifts at that location. *See* DSOF, Ex. G at UASR001065, 1066, 1070, 1077, 1082. Accordingly, JLL's potential liability as a joint employer is limited to alleged wage violations tied to those eleven shifts (plus any additional shifts the Plaintiffs have worked or may work at 1201 New York Ave that are not captured in the timekeeping reports).

Finally, the Defendants take issue with the Plaintiffs' argument in their Opposition that in addition to joint employer liability, JLL might also be held liable as a "general contractor" or "subcontractor" under D.C. Code § 32–1012(c). Reply 20; Opp'n 28. As a general matter, the Defendants are right that summary judgment briefing is not the right place to introduce a new theory of liability. Reply 20; *see also District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263–64 (D.D.C. 2010) ("It is well established that a party may not amend its complaint or broaden its claims through summary judgment briefing."). Even so, the Court is not convinced that this alternative theory reflects a "fundamental change" in the Plaintiffs' approach to proving their claim. *See Trudel v. SunTrust Bank*, 924 F.3d 1281, 1286 (D.C. Cir. 2019) (affirming ruling that

the plaintiffs could not pursue a theory they raised for the first time in opposition to summary judgment and which represented a "fundamental change" to the theory they had pleaded).

Neither the DCMWA nor the DCWPCL define the terms "general contractor" or "subcontractor." *Harris*, 2025 WL 2556568, at *19. Without statutory guidance, courts have looked to the ordinary meaning of these terms. *Id.* (citing dictionary definitions indicating that a "general contractor" is a person or business that contracts to complete a project and coordinates all aspects of it, including hiring and paying subcontractors; and a "subcontractor" is a person or business that undertakes a "particular part" of a large project or contract (cleaned up)). In determining whether people or entities meet these definitions, courts have in turn employed a "functional approach" looking to the role of putative contractors and subcontractors in relation to one another, including, for example, whether a general contractor "exercise[s] supervisory authority over the work performed by the subcontractors." *Harris*, 2025 WL 2556569, at *20 (citing *C.A. Harrison Cos. v. Evans*, 266 A.3d 979, 983–85 (D.C. 2022)).

Here, the Plaintiffs' ability to establish that JLL meets either of these definitions will depend on much the same evidence at issue for establishing joint employer liability. Namely, it will have to convince a jury that JLL's duties as "Sub-Agent" in implementing the contract for GardaWorld's security services at 1201 New York Avenue make it "functionally" a contractor or subcontractor subject to joint and several liability under D.C Code § 32–1012(c). Again, the Court has doubts about whether the Plaintiffs will ultimately prevail on this point. But they have done enough to survive summary judgment and to keep pursuing this theory at trial.

**C.    Stay**

Finally, the Court turns to the Defendants' request for a stay. A court may grant a stay where it finds that doing so is "efficient for its own docket" and is "the fairest course for the

parties." *Hisler*, 344 F. Supp. 2d at 35 (cleaned up). When assessing judicial economy, courts consider whether other independent proceedings are likely to decide important issues in the stayed case. *See Vallejo Ent. LLC v. Small Bus. Admin.,* No. 22-cv-1548, 2023 WL 3275634, at *1 (D.D.C. May 4, 2023). As to fairness, courts require the movant seeking a stay to carry the heavy burden of "demonstrating a 'clear case of hardship.'" *Hisler*, 344 F. Supp. 2d at 35 (quoting *Landis*, 299 U.S. at 255); *see also Nat'l Indus. for Blind v. Dep't of Veterans Affs.*, 296 F. Supp. 3d 131, 138 (D.D.C. 2017) ("[a] stay is not a matter of right, even if irreparable injury might otherwise result" (quoting *Indiana State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 961 (2009))).

Here, nothing counsels in favor of a stay. The Plaintiffs have advised the Court that if a class is certified in *Chang*, they would exercise their right to opt out of that class at the appropriate time. *See* ECF No. 57. Thus, *Chang* is unlikely to decide important issues relevant to the outcome of this matter. This case was also filed before *Chang* and has been ongoing for more than two years. Mr. Rivas and Ms. Velasquez are entitled to have their claims resolved expeditiously.

On the other side, the Defendants have not shown that they will suffer clear hardship without a stay. Their supplemental filing argues that the rule against "one-way intervention" *requires* a stay in this case. Defs.' Suppl. Mem. 1, ECF No. 58. That is not the law. "One-way intervention" arises "when dispositive motions are addressed before class certification motions." *Hyman v. First Union Corp.*, 982 F. Supp. 8, 11 (D.D.C. 1997). "By allowing putative class members to wait while the merits of a claim are decided, these members are given the ability to watch the proceedings without any risk to their individual claims which would be precluded by an adverse ruling on the merits." *Id.* But as the Defendants are forced to concede, "traditionally the concern of one-way intervention is raised within a single matter." Defs.' Suppl. Mem. 7. Here, the Plaintiffs filed the instant lawsuit before different plaintiffs filed putative class actions—and the

Plaintiffs here have expressly stated that they intend to opt out of any class that might be certified down the road. One-way intervention is simply not implicated in such circumstances.

The cases cited by the Defendants do not alter this conclusion. *Hyman v. First Union Corp.*, *Koehler v. USAA Casualty Insurance Co.*, and *Gomez v. Rossi Concrete Inc.*, all involved putative class actions where individual plaintiffs sought dispositive rulings on merits questions before class certification. *See Hyman*, 982 F. Supp. at 10–11; *Koehler v. USAA Cas. Ins. Co.*, No. 19-cv-715, 2019 WL 4447623, at *5 (E.D. Pa. Sept. 17, 2019); *Gomez v. Rossi Concrete Inc.*, No. 08-cv-1442, 2011 WL 666888, at *1– *2 (S.D. Cal. Feb. 17, 2011). And while *In re Zetia* involved multiple lawsuits, those suits were "consolidated for preliminary proceedings" in front of a single court as part of multi-district litigation in which the plaintiffs had been "proceed[ing] in lockstep." *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-MD-2836, 2021 WL 9870367, at *1, *5 (E.D. Va. May 7, 2021). Accordingly, all those cases were effectively "single matters" that involved circumstances readily distinguishable from those present here.

The Defendants also rely on a Seventh Circuit decision, which they say articulates their fear of being "pecked to death by ducks." *See Premier Elec. Const. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 363 (7th Cir. 1987). That, too, does not support a stay. There, the Seventh Circuit explained that the Rule 23 framework, which was revised to prevent "one-way intervention," requires a putative class member to "cast his lot at the beginning of the suit" and then be "bound by the results." *Id.* at 362. He may do so by choosing to either remain part of the class or opt out to "take his chances separately," in which case the "separate suit . . . proceed[s] as if the class action had never been filed." *Id.* Here, Mr. Rivas and Ms. Velasquez have chosen to proceed separately. Indeed, they brought this lawsuit before any of the pending class actions were even filed and have reiterated their desire to have their claims heard here.

Ultimately, the Plaintiffs in this case seek to have their claims heard expeditiously, having filed them more than two years ago. And they have represented an intent to opt out of any class that gets certified in any other case. The Defendants have pointed to no authority suggesting a stay is warranted in these circumstances. And in fact, other courts have rejected similar arguments to the ones the Defendants have made here. *See In re Jefferson Par.*, 81 F.4th 403, 409–414 (5th Cir. 2023); *Farrar v. Catalinanrestaurant Grp.*, No. 15-cv-2407, 2016 WL 2610110 (S.D. Cal. May 6, 2016). Accordingly, the Court exercises its discretion to deny the Defendants' request for a stay. This case will proceed to trial on the claims that survive summary judgment.[10]

---

[10] The Defendants appear quite frustrated with counsel for the Plaintiffs, noting that this is one of eighteen cases filed by counsel against GardaWorld raising similar claims and allegations regarding payment of wages for security officers. *See* Defs.' Suppl. Mem. 1, ECF No. 58. At the outset, the Court finds these frustrations disingenuous given the recent revelation from counsel for the Plaintiffs that they provided GardaWorld with a proposal for coordinating the many pending actions to achieve prompt resolution—a proposal that GardaWorld apparently "completely ignored." Pls.' Opp'n to Defs.' Mot. to Stay at 12, ECF No. 60; Ex. A, ECF No. 60-1. In urging that a stay is required, the Defendants point out that the individual plaintiffs in these lawsuits would all be putative members of one or both the consolidated class actions pending before other courts in this District should classes be certified. But the Defendants' frustrations with counsel for the Plaintiffs have nothing to do with *this* case and *these* Plaintiffs. While the Court understands that GardaWorld would prefer not to defend multiple lawsuits raising similar legal issues, nothing prevents individual plaintiffs from pursuing individual relief, particularly when GardaWorld is *opposing* class certification in the two pending putative class actions and refuses to work with counsel for the Plaintiffs to resolve these cases. As the Plaintiffs' counsel explained at the most recent status conference, individual plaintiffs may file individual lawsuits, particularly given that class actions are typically lengthy in duration and these plaintiffs earning a minimum wage continue to hold positions for which they allege they are being underpaid. Ultimately, the only thing that is relevant here is that these Plaintiffs, Mr. Rivas and Ms. Velasquez, have expressed a desire for this Court to decide this lawsuit now. And they have represented that even if a class is certified elsewhere at some point down the road, they will opt out of that class. Indeed, the Court pressed counsel on whether the Plaintiffs understood that a negative ruling here would in fact preclude them from obtaining any relief that is awarded to any class that is certified. Counsel confirmed this to be true.

## CONCLUSION

For all these reasons, the Court grants in part and denies in part the Defendants' Motion for Summary Judgment, and denies the Defendants' alternative Motion to Stay. ECF No. 43.

A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   February 20, 2026